UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRENDA FARNSWORTH,

     Plaintiff,

                             CASE NO.:    8:15-cv-65-T-24-MAP

v.

HCA, INC., HEALTTRUST INC. – THE
HOSPITAL COMPANY, GALENCARE,
INC. d/b/a NORTHSIDE HOSPITAL, and
PARALLON BUSINESS SOLUTIONS, LLC

     Defendants.

_____/

## ORDER

This cause is before the Court on Defendants' Motion to Dismiss Plaintiff's Amended Complaint. Dkt. 11. Plaintiff Brenda Farnsworth filed a Response in Opposition. Dkt. 18. With leave of Court, Defendants filed a Reply in support of the Motion to Dismiss. Dkt. 24. The Court, having reviewed the motion and being otherwise advised, concludes that Defendants' Motion to Dismiss should be GRANTED and that Plaintiff shall be given leave to amend the complaint.

## I.    MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to make "a short and plain statement of the claim showing that the pleader is entitled to relief." A plaintiff must make sufficient factual allegations "to a state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007). Plausibility requires that the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the Residence Inn is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "The complaint need not include detailed factual allegations, but it must set forth

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Christman v. Walsh*, 416 F. App'x 841, 844 (11th Cir. 2011) (internal quotation marks and citation omitted).

The Eleventh Circuit suggests that district courts undertake a two-step approach in evaluating a motion to dismiss: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citation omitted).  Accordingly, all "legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010).

## II.    BACKGROUND

Plaintiff Brenda Farnsworth brings this False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732, lawsuit against her former employer and its related entities.  On August 1, 2011, Farnsworth began her six-month employment with Defendant Northside Hospital as Vice President of Quality and Risk Management.  Prior to her employment at Northside Hospital, Farnsworth had been employed in the quality and risk heath care field for over twenty years.  Dkt. 8, ¶ 19.

Northside Hospital is a 288-bed teaching hospital.  *Id.*, ¶ 10.  Defendant Parrallon Business Solutions, LLC ("Parallon") provides medical records personnel to Northside Hospital and is responsible for billing the Center for Medicare and Medicaid Services ("CMS") for medical services provided at Northside Hospital.  *Id.*, ¶ 11.  Parallon is a subsidiary of Defendants HCA, Inc. and Healthtrust, Inc.-The Hospital Company (together, "HCA").  *Id.*  HCA is also the parent corporation of Northside Hospital and directs the policies and procedures followed by the staff at Northside Hospital.  *Id.*, ¶ 9.  During Farnsworth's six-month employment at Northside Hospital,

approximately 50% of the patients at the hospital used Medicare or Medicaid benefits to pay for their medical services. *Id.*, ¶ 13.

On February 6, 2012, Farnsworth was placed on administrative leave.  On April 6, 2012, she filed a qui tam complaint under seal in this Court alleging that Defendants violated the FCA, including its retaliation provision.  *See United States ex. Rel. Farnsworth v. Hosp. Corp. of Am.*, No. 8:12-cv-734-T-27TGW (M.D. Fla. April 6, 2012) at Dkt. 1.  The United States declined to intervene on May 20, 2013 and the complaint was unsealed.  *See* 8:12-cv-734-T-27TGW at Dkts. 2, 3.  Defendants moved to dismiss the complaint and, shortly thereafter, Farnsworth voluntarily dismissed the complaint.  8:12-cv-734-T-27TGW at Dkts. 14, 22.

Approximately one year later, on January 13, 2015, Farnsworth filed the complaint in this case (Dkt. 1), which contained *the same* FCA allegations as alleged in her previously dismissed 2012 case.  On February 3, 2015, Farnsworth filed the Amended Complaint, which purports to be limited to a retaliation claim under the FCA pursuant to 31 U.S.C. § 3730(h).  Dkt. 8.  Defendants move the Court to dismiss the Amended Complaint with prejudice.  Dkts. 11, 24.  Farnsworth argues that the motion to dismiss should be denied, or, in the alternative, that she be given leave to amend her complaint.  Dkt. 18.

### A. <u>False Claims Act Retaliation</u>.

In the Amended Complaint, Farnsworth asserts a retaliation claim under the FCA.  The False Claims Act is the primary statute upon which the government relies to recover losses caused by fraud perpetrated in the form of "false claims."  *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).  To encourage employees to report violations of the FCA, a whistleblower provision (31 U.S.C. § 3760(h)) gives employees the right to bring a retaliation claim against their employer if they are discriminated against in their employment

3

because of their attempts to stop one or more of the false claims enumerated in the FCA.  *Ingle v. Janick*, No. 2:14-cv-544-FtM-39DNF, 2014 WL 6469412, at *3 (M.D. Fla. Nov. 17, 2014).  Even if the employee is not aware of the FCA at the time she attempted to stop the false claim, the employee still has the right to bring an FCA retaliation claim.  *Id.* (citing *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996) ("[N]othing in the language of § 3760 suggests that its protections are limited to those who were motivated by it.")).

In order to state FCA retaliation claim, a plaintiff must allege three elements: (1) she was acting in furtherance of a FCA enforcement action or other efforts to stop violations of the FCA, *i.e.*, engaging in protected conduct, (2) the employer knew that the employee was engaged in the protected conduct, and (3) the employer was motivated to take an adverse employment action against the employee because of the protected conduct.  *United States v. KForce Gov't Solutions, Inc.*, No. 8:13-cv-1517-T-36TBM, 2014 WL 5823460, at *10 (M.D. Fla. Nov. 10, 2014); *Mack v. Augusta–Richmond Cnty., Ga.,* 148 F. App'x 894, 896–97 (11th Cir. 2005).  As amended in 2009, the FCA protects employees that have been "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee…in furtherance of an action under this section *or other efforts to stop one or more violations of this subchapter*."  31 U.S.C. § 3760(h)(1) (emphasis added).

The 2009 amendment to the FCA more broadly defines the scope of protected activity.  The new language makes clear that section 3730(h) not only protects actions taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy fraud through other means, such as by internal reporting to a supervisor or compliance department, or refusing to participate in unlawful activity.  *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 n.

4

5 (11th Cir. 2010) (noting that "Congress's recent amendment provides relief to any employee discharged for acting 'in furtherance of other efforts to stop 1 or more violations of this subchapter'"); 155 Cong. Rec. E1295, E1300 (daily ed. June 3, 2009) (statement of Cong. Berman) (stating that the amendments make "clear that this subsection protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through means such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct"). "No nexus to actual or threatened litigation is required, in contrast to the former version of the statute, which measured a retaliation claim by the likelihood of a substantive FCA suit being brought." *Bell v. Dean*, No. 2:09-cv-1082-WKW WO, 2010 WL 2976752, at *1 (M.D. Ala. July 27, 2010). Although the amended statute is broader in the scope of protected activity, courts still assess whether the person's actions "were taken to stop one or more violations of the Act." With this framework in mind, the Court sets forth the allegations in Farnsworth's Amended Complaint. [1]

## B.  <u>The Amended Complaint: General Allegations</u>.

As Vice President of Quality and Risk Management, Farnsworth was responsible for assuring compliance with Medicare guidelines and preparing Northside Hospital for a full CMS survey. Dkt. 8, ¶ 72. Farnsworth was also responsible for supervising the review of medical records when a patient had a hospital-acquired condition. *Id.*, ¶ 77. The Amended Complaint does

---

[1] Farnsworth alleges that Defendants retaliated against her because she had knowledge of false billings and tried to stop the hospital from submitting false bills to Medicare and Medicaid. Because Farnsworth's retaliation allegations do not depend on allegations of fraud, the complaint need only "a short and plain statement of the claim showing that [she is] entitled to relief." Fed. R. Civ. P. 8(a); *see Sanchez,* 596 F.3d at 1304 (finding that the plaintiff's retaliation claim, which was based on internal reporting of unlawful actions, did not depend on allegations of fraud and needed only to meet the pleading standard required under Rule 8(a)); *Ingle v. Janick*, No. 2:14-cv-544-FtM-38DNF, 2014 WL 6469412, at *5 (same).

not outline any additional job duties specific to her role as Vice President of Quality and Risk Management.

Farnsworth asserts that while working at Northside Hospital, she "repeatedly voiced concerns regarding various activities and techniques of the medical staff that were endangering patients' health and welfare." *Id.*, ¶ 19. Such practices caused a detrimental effect on the quality of care to Medicare and Medicaid patients at the hospital. *Id.*, ¶ 20. Farnsworth voiced such concerns to the Chief Executive Officer, Steven Daugherty, and the Chief Nursing Officer, Pam Carroll. *Id.*, ¶ 19. Farnsworth asserts that these acts or omissions (as described below) were knowingly committed by personnel at Northside Hospital in an attempt to secure federal funds or to retain federal funds already paid to Northside Hospital. *Id.*, ¶ 23. Farnsworth states that she is not able to plead some of the specific acts, omissions, patients, and dates related to the false claims because the necessary information is in Defendants' custody and control. *Id.*, ¶ 24.

Farnsworth alleges that Defendants routinely billed Medicare and Medicaid for the treatment of certain patients even though a teaching physician was not physically present when the medical intern or resident performed the procedure. *Id.*, ¶ 29. Farnworth provides specific examples of instances where a patient was never treated by an attending (or teaching) physician, but Defendants billed Medicare or Medicaid for the medical services as though the attending physician had supervised the procedures performed by the residents and interns. *Id.*, ¶¶ 31-38, 39-40, 41-42, 43-51, 52-53, 55-56. Farnworth contacted Florida's Agency for Health Care Administration ("ACHA") regarding an incident with a patient that lost a portion of her leg due to an unsupervised resident's failure to follow the treating physician's treatment order.[2] Farnsworth was told that she should have discussed reporting the incident with Northside Hospital's CEO

---

[2] Farnsworth does not assert whether she contacted ACHA in order to report the improper medical practice or to report a false billing.

Steven Daughtery before calling ACHA.  *Id.*, ¶ 50.  Farnsworth does not state whether she ever brought the incident to the CEO's attention.  She alleges that Defendants fraudulently billed Medicare for the medical services rendered to that patient as though the supervising physician was present during the procedure performed by the resident.  *Id.*, ¶ 51.  Farnsworth does not allege that she reported the fraudulent billing for the unsupervised medical treatments provided by residents and interns to anyone at Northside Hospital.  Nor does she allege that she did anything to prevent or stop the fraudulent billing.

Farnsworth also alleges that Defendants falsified medical records they submitted to Medicare and Medicaid for procedures and services ordered by a suspended physician, Dr. Hazem Al-Andary.  *Id.*, ¶ 63(a)-(s).  Farnsworth asserts that on nineteen occasions occurring on December 23, 29, and 30 of 2011, a Northside Hospital employee would enter orders into the computer that were ordered by Dr. Al-Andary, but falsely use other physicians' names as the ordering physician.  *Id.*  Defendants falsely billed Medicare and Medicaid for the services, which were ordered by Dr. Al-Andary while he was suspended.  *Id.*, ¶ 65.  Farnsworth does not assert that she raised the issue of billing Medicare and Medicaid for procedures and services ordered by a suspended physician to anyone at the hospital.  Nor does Farnsworth allege that she attempted to prevent or stop billing Medicare and Medicaid for such procedures and services.

Farnsworth alleges that Northside Hospital violated Medicare and Medicaid billing guidelines because its medical records personnel were not hospital employees.  *Id.*, ¶¶ 66-88.  In 2010 (before Farnsworth began her employment), the employees working in the medical records department of Northside Hospital were no longer employed by Northside Hospital and were instead employed by a wholly owned subsidiary of HCA named HSS Systems, LLC.  *Id.*, ¶ 68.  In May 2011, Parallon assumed the medical records services from HSS Systems, LLC.  *Id.*, ¶ 70.  On

January 2012, Farnsworth was copied on emails between the Director of Medical Records for Northside Hospital, Krystle Booth, and the Chief Financial Officer at Northside Hospital, Gary Searls, in which Booth asked Searls why the medical records personnel were no longer employed by the hospital. *Id.*, ¶ 72. Searls presumably forwarded the email to an employee of Parallon (and to the Vice-President of Quality for HCA, Linda Lemon-Steiner), who responded to Searls that "We are all employees of HCA, so I am of the opinion we are compliant with the guideline." *Id.*, ¶ 73. Searls instructed Farnsworth and Booth to avoid discussing Parallon's employment of the medical records personnel with the CMS surveyors. *Id.*, ¶ 74. Farnsworth does not allege that she reported the perceived problem with the Parallon employees to her superiors or to the CMS surveyors. Nor does Farnsworth allege that she did anything to prevent or stop Parrallon employees from working in Northside Hospital's medical records department.

Farnsworth alleges that on several occasions when she found a mistake in the medical records, Parallon employees refused to question the physician providing the medical service in order to correct the billing code. *Id.*, ¶¶ 78, 79. This refusal, Farnsworth asserts, led to improper billing of Medicare and Medicaid. *Id.*, ¶¶ 78, 79. Farnsworth does not assert that she reported the violations or refusals to act to her superiors or that she did anything to prevent or stop the improper billing. Nor does she assert that she found anything other than a "mistake" in the records.

Farnsworth refers to an alleged incident of sexual abuse at the hospital in November 2011. *Id.*, ¶ 81. Farnsworth does not allege how she learned of the incident, but states that once she became aware of it, she told Monica Zeiss, the Assistant Chief Nursing Officer of Northside Hospital, to report the incident pursuant to Florida law. *Id.*, ¶ 82. The case was the subject of a for cause ACHA survey on December 21, 2012. *Id.* Farnsworth alleges that Ms. Zeiss misled the ACHA surveyor as to why the sexual abuse was not immediately reported and that an email from

Ms. Zeiss to Chief Nursing Officer Pam Carroll shows that Ms. Zeiss knew of the alleged incident days before it was reported. *Id.*, ¶ 83. Farnsworth reviewed the email with the ACHA surveyor and alleges that Steven Daughtery (CEO) "reprimanded" her for doing so and questioned why Farnsworth did not prevent the surveyor from viewing the email. *Id.* Farnsworth does not allege that she notified any of her superiors regarding the late report of the sexual abuse incident. Nor does she assert that the incident led to the filing of a false claim by Northside Hospital.

Farnsworth asserts that Defendants "double billed" Medicare and Medicaid for unauthorized medical research. According to Farnsworth, Northside Hospital's Board of Directors (the "Board") or the Medical Executive Committee must preapprove medical research on patients as required by the Board Charter and "other regulatory standards." *Id.*, ¶ 90. Farnsworth discovered the unauthorized medical research sometime after September 2011 and was directed by CEO Steven Daughtery to mislead the Board by not including the fact in her report to the Board that not all trials had appropriate approval. *Id.,* ¶ 93. Farnsworth states that she reported the lack of preapproval to the Board. *Id.*, ¶ 94. Farnsworth does not explain how or when she reported the lack of preapproval or whether she did anything to prevent or stop the billing. She also does not allege whether such reporting was part of her job duties as Vice President of Quality and Risk Management. Farnsworth claims that Defendants billed Medicare and Medicaid for the "ineligible medical services" even though payment had already been received from the research grant funds, resulting in "double billing." *Id.*, ¶ 95.

The Amended Complaint contains allegations that Northside Hospital was deliberately understaffed in order to increase profits and that Farnsworth complained about the unsafe understaffing to CEO Daughtery "on numerous occasions." *Id.*, ¶¶ 111, 112. In response, Daughtery refused to provide "adequate staff." *Id.*, ¶ 112. Farnsworth also alleges that once she

learned that the intensive care unit ("ICU") director misled ACHA surveyors about the nurse to patient ratio in the ICU, she contacted an ACHA surveyor to inform her of the misrepresentation. *Id.,* ¶ 114.  Farnsworth does not allege whether monitoring staffing levels was part of her job as Vice President of Quality and Risk Management.  Nor does she assert that the understaffing issue led to the submission of a false claim to Medicare or Medicaid.

## C.  Farnsworth's False Claims Act Retaliation Claim.

Farnsworth's FCA retaliation claim revolves around "for cause" surveys of Northside Hospital by ACHA surveyors and others.  Approximately three weeks after Farnsworth began working at Northside Hospital, on August 25, 2011, ACHA surveyors conducted a for cause survey in response to complaints[3] filed with the agency.  Dkt. 8, ¶ 124.  During an October 6, 2011 survey, performed by Triennial Joint Commission[4], the commission found that numerous medical records were deficient.  *Id.*, ¶ 125.  Farnsworth alleges that she assisted the commission in this finding, but does not elaborate on the nature of the deficiency.  Then, as a result of an unannounced December 2011 ACHA for cause survey regarding patient care, ACHA discovered that medical records had been altered and amended, and ACHA recommended a full CMS survey be conducted.  *Id.*, ¶¶ 126, 127.

On February 2, 2012, Farnsworth prepared a complaint for the Assistant Vice President of Human Resources of HCA to put her on notice of Northside Hospital's noncompliance with several laws, rules, and regulations.  *Id.*, ¶ 128.  Farnsworth does not allege what type of non-compliance she reported and whether such reporting was part of her job.  Nor does she assert that the complaint contained information regarding false claims submitted to Medicare and Medicaid.

---

[3] Farnsworth does not assert who filed the complaints, when the complaints were filed, or the nature of the complaints.

[4] Farnsworth does not include allegations explaining Triennial Joint Commission's role.

Farnsworth was told that the West Florida Division Vice President would be in charge of investigating the complaint and an appointment to discuss the complaint was set for February 6, 2012. *Id.* Instead, on February 6, 2012, Farnsworth was placed on administrative leave and escorted from Northside Hospital. *Id.*, ¶ 129. Farnsworth was instructed not to contact any employees of Northside Hospital. *Id.* On February 20, 2012, Northside Hospital offered Farnsworth a severance package, which she declined to accept. *Id.*, ¶ 132.

Beginning on February 29, 2012, ACHA conducted a three day full CMS survey. *Id.,* ¶ 130. Although Farnsworth had rejected the severance package and was on administrative leave, she "secretly" assisted the surveyors by telephone to help them find numerous discrepancies in the medical records. *Id.*, ¶¶ 131, 135. ACHA found that "rules and laws" were violated at Northside Hospital.[5] *Id.*

In a letter dated March 9, 2012[6], the attorney for Northside Hospital claimed that Farnsworth had been placed on administrative leave for insubordination. *Id.*, ¶ 133. Farnsworth asserts that she was placed on leave because she had knowledge of fraudulent conduct at Northside Hospital, including false billings in violation of the FCA and that she acted in opposition to those practices in an effort to stop them. *Id.*, ¶ 134. However, Farnsworth does not explain how she acted in opposition. Farnsworth does not allege when she was officially terminated from her employment at Northside Hospital or even if she was terminated. Instead, Farnsworth asserts that she has not been allowed to return to Northside in her position as Vice President of Quality and Risk Management and has been damaged by the loss of employment. She seeks judgment against Defendants HCA and Northside Hospital for twice the amount of her back pay, together with special damages and compensatory damages. *Id.*, ¶ 143. Farnsworth asks to be reinstated in her

---

[5] Farnsworth does not allege what rules and laws were allegedly violated.
[6] The letter is not attached to the Amended Complaint.

position with the seniority she would have earned had the retaliation not occurred, or alternatively, be granted front pay.  *Id.*

## III.    <u>DISCUSSION</u>

In a lengthy complaint, Farnsworth details numerous bad acts or practices by Defendants. However, as noted above in the discussion of the facts, most of the incidents or practices about which Farnsworth complains do not contain any allegation that Farnsworth (1) did anything to stop or prevent an incident or practice from occurring, and/or (2) that she reported the incident or practice to her superiors so that they were aware of the problem and aware that Farnsworth was trying to stop it.   In addition, in those instances when Farnsworth did internally report, the complaint does not allege that the conduct or practice resulted in the submission of a false claim to the government.

For example, Farnsworth alleges various problems relating to Dr. Al-Andary's orders, non-employee medical records personnel, and mistakes in medical records, but she sets forth no allegations that she did anything to oppose such practices or inform her superiors about them. Conversely, while Farnsworth alleges that she acted in opposition to the late reported sexual abuse and understaffing, she does not explain how such opposition relates to the submission of a false claim to the government.

Additionally, while Farnsworth complains that Defendants improperly billed for medical students and interns performing procedures without an attending doctor present, she does not connect her opposition to the resulting improper billing or the submission of a false claim to the government.  Instead, she alleges that she reported an incident to ACHA, but it is unclear whether she reported the improper medical practice to ACHA, as opposed to the improper billing that also resulted.

Likewise, Farnsworth alleges that Defendants engaged in medical research that was not preapproved by the Board of Directors and that Defendants double billed for this research. While Farnsworth alleges that she went to the Board regarding the non-approved research, she alleges only that she informed the Board that the medical research was not preapproved. She does not allege that she told the Board about the double billing or submitting false claims to the government.

Farnsworth also sets forth random, vague allegations regarding an August 25, 2011 ACHA investigation, an October 6, 2011 Triennial investigation, a December 2011 ACHA investigation, a February 29, 2012 ACHA investigation, and her own February 2, 2012 complaint to Defendants. However, she does not connect her involvement in these events to medical billing. At best, she alleges that there were problems with medical records, but that does not necessarily equate to problems with Medicare and Medicaid billing.

Throughout the Amended Complaint, Farnsworth does not specifically assert that she took part in any action that opposed a false claim to Medicare and Medicaid. Unlike the plaintiff in *Bell v. Dean*, 2010 WL 2976752, at *1, who made explicit internal threats to report what he viewed as unauthorized use of federal funds that were received as a result of false submissions to the government, Farnsworth does not allege that her internal reporting was specifically concerned with fraudulent billings to the government. *See, e.g., Manfield v. Alutiiq Int'l Solutions, Inc.*, 851 F. Supp. 2d 196, 202-03 (D. Me. 2012) (finding that the report of violations of regulatory and patient care standards were not protected conduct under the FCA because they were not related to FCA violations and stating that "an employee's [internal] reports must be related to an FCA violation to constitute protected conduct"). Rather, Farnsworth's concerns and internal reporting, as alleged, were compliance related. Farnsworth must allege facts to show that her actions (internal reporting) were undertaken "in furtherance of other efforts to stop one or more violations" of the FCA, which

Farnsworth asserts were false submissions to Medicare and Medicaid. *Id.* (quoting 31 U.S.C. § 3730(h)).

Although Farnsworth, in summary fashion, alleges she opposed and made efforts to stop violations of the False Claims Act by Defendants, she does not assert a factual basis for this contention. Furthermore, there is a question as to whether such efforts were merely part of Farnsworth's job duties in her role as Vice President of Quality and Risk Management. *KForce*, 2014 WL 5823460, at *10-11.

### IV.    CONCLUSION

The Court grants Defendants' motion to dismiss and dismisses the Amended Complaint without prejudice granting Plaintiff leave to amend.  In the second amended complaint, Plaintiff should focus on those instances that Farnsworth reported a billing violation (and not a compliance issue as part of her job) to her superiors, and whether she did anything to oppose the billing violation, rather than the plethora of extraneous, irrelevant, and inflammatory allegations that have no bearing on her FCA retaliation claim.  Plaintiff also needs to be specific as to which Defendant or Defendants she is alleging engaged in the false claims.  Plaintiff shall file an amended complaint by June 18, 2015.

**DONE AND ORDERED** at Tampa, Florida, this 29th day of May, 2015.

*Susan C. Bucklew*

SUSAN C. BUCKLEW
United States District Judge

**Copies furnished to:**
Counsel of Record

14