IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**BRENDA FARNSWORTH,**

    Plaintiff,

vs.                                                      CASE NO.:   8:15-cv-00065-SCB-MAP

**HCA INC, HEALTHTRUST, INC. - THE
HOSPITAL COMPANY, GALENCARE, INC.
d/b/a NORTHSIDE HOSPITAL, and
PARALLON BUSINESS SOLUTIONS, LLC,**

    **Defendants.**
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff, BRENDA FARNSWORTH, files this response to Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint. (Doc. 32).

**OVERVIEW**

Defendants' Motion should be denied because, in accordance with Court's Order on Defendants' prior Motion, Plaintiff's Second Amended Complaint includes a plethora of specific instances in which Farnsworth reported False Claim Act ("FCA") billing violations. It details when Farnsworth opposed the billing violations, and includes specific dates, times, and names of people to whom she reported her opposition to Defendants' widespread False Claim Act violations. Notably, much of Defendants' Motion improperly asks the Court to make factual determinations and adjudicate on both the veracity and viability of Farnsworth's claims, which is simply not the applicable standard at the 12(b)(6) stage.

Moreover, the Motion should be denied because Defendants continue to rely upon an outdated version of § 3730 that was revised prior to the acts complained of in this case. The

older version of the False Claims Act ("FCA") retaliation provision protected only those claimants who engaged in conduct that reasonably could lead to a *viable* FCA action. However, on May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009) ("FERA"). Post-FERA, lawful acts done simply "in furtherance of other efforts to stop" a violation of the FCA are now protected conduct. Plaintiff's Second Amended Complaint sufficiently alleged that she acted in "furtherance of other efforts to stop to 1 or more" FCA violations. These allegations, which must be accepted as true, constitute classic protected conduct under FERA. Plaintiff also alleges that she was terminated soon after she reported these issues *because* of her efforts to stop FCA violations. These allegations establish Plaintiff's *prima facie* case. For these reasons, and as set forth below, Defendant's Motion should be denied.

## MEMORANDUM OF LAW

I. **Legal Standard.**

In ruling on a motion to dismiss for failure to state a claim, the Court "must accept the allegations set forth in the complaint as true." *Lotierzo v. Woman's World Med. Ctr., Inc.*, 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. *See Omar ex. rel. Cannon v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003). Nonetheless, plaintiffs must still meet some minimal pleading requirements. *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary," the complaint should "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (*quoting Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974,

167 L. Ed. 2d 929 (2007)). Plaintiff has easily satisfied these pleading requirements as to her §3730(h) claim.

      **A.    Plaintiff's Second Amended Complaint Sufficiently Pled a Prima Facie Case.**

The Supreme Court has stated that a party bringing a claim under § 3730(h), like Plaintiff has done here, can succeed even if her employer never engaged in any fraudulent activity. *See Graham County Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415, n. 1 (noting "that proving a violation of § 3729 is not an element of a § 3730(h) cause of action"). "A prima facie case of retaliation under 31 U.S.C. § 3730(h) requires only that the plaintiff suffer some 'adverse action' as a result of engaging in protected activity." *United States ex rel. Schaengold v. Mem'l Health, Inc.*, 2014 U.S. Dist. LEXIS 174977, 62 (S.D. Ga. Dec. 18, 2014). This is a standard that Defendants' Motion fails to acknowledge.

      **1.    Plaintiff's Protected Activities.**

There are two ways in which a claim for reimbursement by a health care provider may be condemned as false or fraudulent, and therefore actionable, under the Act. The first — known as "factually false" or "direct" fraud — occurs when a provider submitting a claim supplies "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States ex rel. Ortolano v. Amin Radiology*, 2015 U.S. Dist. LEXIS 9724, 10 (M.D. Fla. Jan. 28, 2015) (*quoting Mikes v. Straus*, 274 F.3d 687, 697 (2nd Cir. 2001)). In such cases, application of the False Claims Act is fairly straightforward. *Id*. at 114. The second, known as a "false certification theory," occurs "when the claimant (here hospital organizations) knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States v. Medquest*

3

*Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013) (*quoting United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3rd Cir. 2011)).

In order for Defendants to receive payment from Medicare on the treatments provided to Patient X, Defendant was required to certify that the information coded and then submitted as to Patient X from Example 1 was true, accurate, and complete. This is commonly referred to as a "condition of payment." Such conditions of payment are requirements that must be satisfied before a claim will be paid by the Government. *See generally United States ex rel. Ortolano v. Amin Radiology*, 2015 U.S. Dist. LEXIS 9724, 19 (M.D. Fla. Jan. 28, 2015). "Failure to comply with a condition of payment may properly form the basis for an FCA suit under the theory that payment should not have been made on the claim absent compliance with the condition of payment."[1] Therefore, if the false certification clearly relates to a condition of payment, courts generally have found that the claim satisfies the "falsity" element of the FCA.[2]

Below are multiple -- and specific -- examples of the protected activities Plaintiff engaged in which are taken nearly word-for-word from her Second Amended Complaint:

> **Unsupervised Interns and Residents Services Billed at Attending Physician Rates.**
>
> Defendants routinely billed Medicare for the treatment of certain patients even though a teaching physician (*i.e.*, an attending physician) was not physically present when a medical intern, or resident, actually performed the medical procedures on the patient. (SAC, ¶ 17).
>
> For example, late in the afternoon of May 28, 2011, J.Q., a 44 year old patient, was admitted to Northside Hospital from the Pinellas County Jail....Defendants fraudulently billed Medicaid for the medical services as though Dr. Lopez and Dr. Kamath were supervising the procedures performed by the resident….A similar incident occurred on September 11, 2011, Dr. Joseph Zalocha of Northside

---

[1] "Violations of Payment/Participation Conditions as Predicates for False Claims", *Katherine A Lauer, et al.*, Health Law Litigation, ABA, Spring/Summer 2011, Vol. 9, No. 2.

[2] *Id*. (*citing to United States v. Dialysis Clinic, Inc*., 2011 U.S. Dist. LEXIS 4862, 1, 2011 WL 167246 (N.D.N.Y Jan. 19, 2011)).

> Hospital falsified medical documents to reflect that he was present for inpatient services performed by resident Dr. Krystle Bujold on patient R.M. Defendants fraudulently billed Medicare for the medical services as though Dr. Zalocha was supervising the procedures performed by resident Dr. Bujold. (SAC, ¶¶ 20, 21).
>
> Plaintiff discovered [the above] two incidents of fraud in early December of 2011, after she was hired and began to review various records while becoming acquainted with Defendants' records and system. Plaintiff objected to these billing practices by Defendants and reported the fraudulent billing incidents to Steven Daughtery, Northside CEO, Gary Searles, Northside CFO, Maggie Miklos, Defendants' Human Resources Director, and Audra Earle, Northside Chief Operating Officer and Chief Compliant Officer, on a weekly basis beginning on or about December 15, 2011 through the end of January of 2012. Plaintiff warned each of these individuals repeatedly during this timeframe that such actions constitute submission of false claims to the United States Government. Additionally, two meetings were held with division level staff, including Vice President Linda Lemonsteiner, during which these same issues were raised by Plaintiff. Defendants took no action to remedy these issues. They wanted to ensure their fraudulent billing practices continued in order to increase their bottom line, and to pad the bonuses paid to Defendants' leadership team. (SAC, ¶ 22).

These are only two of the six specific instances of FCA violations included under the "Unpaid Interns and Residents Services Billed at Attending Physician Rates" section of Farnsworth's Second Amended Complaint. In each of the six separate instances, Farnsworth identified the specific FCA violation, how it was carried out, patient names, intern/resident and physician provider names, dates of violation and of the procedures performed, date of discovery of the FCA violation by Farnsworth, when she reported, and to whom. (SAC, ¶¶ 20, 21, 23-27). This is more than sufficient to satisfy Farnsworth's burden at the pleading stage in terms of the first element of her prima facie FCA retaliation case. However, Farnsworth's Second Amended Complaint includes many more instances of protected conduct.

For example, under the next section of her Second Amended Complaint, styled "Falsified Medical Records Relating to Suspended Physicians," Farnsworth alleges the following:

> In December of 2011 Defendants submitted numerous fraudulent documents to Medicare and Medicaid regarding medical treatment that was actually performed

5

by suspended physicians, but falsely billed under another physician's name. In order to get the medical bills paid by Medicare and Medicaid, the identities of the suspended physicians who actually treated the patients were not included in the medical records....Additional examples of these illegal billing practices by Defendant to which Plaintiff objected to include the following incidents:

> (a) On December 23, 2011, a Northside Hospital employee, Jennifer Miller, fraudulently entered an order into the computer for Patient A.A., for "soap sud enema now" ordered by Dr. Hazem Al-Andary, who was suspended. Even though Dr. Fadi Saba did not make the order, Jennifer Miller falsely used his name when she entered the order into the computer;
>
> (b) On December 29, 2011, a Northside Hospital employee, Caretta Allen, falsely entered an order into the computer for Patient J.W. for "DC Stroke protocol" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Caretta Allen falsely used his name when she entered the order into the computer.
>
> (c) On December 30, 2011, a Northside Hospital employee, Michele Routh, falsely entered an order into the computer for Patient J.W. for "1800 Calorie/day diet" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Michele Routh falsely used his name when she entered the order into the computer (SAC, ¶ 28).

Farnsworth goes on to list no fewer than *sixteen* additional examples of illegal billing practices committed by Defendants, with dates, patient and provider names. (SAC, ¶¶ 28, (d)-(s)). Then, Farnsworth's Second Amended Complaint alleges that in each instance, "…Defendants billed Medicare and Medicaid even though these services were ineligible for Medicaid reimbursement without a valid physician's order." (SAC, ¶ 28). Next, Plaintiff provides critical information on what she did to object to these FCA violations, when she reported them, to whom, and even specifically alleged that she told Defendants these actions constituted the "submission of false claims to the United States Government":

> Upon discovering these issues in late December of 2011 and early January of 2012 Plaintiff objected to these billing practices by Defendants and reported the fraudulent billing incident to Steven Daughtery, Northside CEO, Gary Searles,

>Northside CFO, Maggie Miklos, Defendants' Human Resources Director, and Audra Earle, Northside Chief Operating Officer and Chief Compliant Officer, on a weekly basis through the end of January of 2012. Plaintiff warned each of these individuals repeatedly during this timeframe that such actions constitute submission of false claims to the United States Government.

Although these allegations should suffice to overcome Defendants' Motion, Farnsworth's Second Amended Complaint goes on to include more instances of protected conduct. Next, Farnsworth alleges that Defendants' engaged in one of the most basic types of false claims schemes: double-billing. (SAC, ¶ 31). Specifically, Farnworth's Second Amended Complaint alleges "Defendants also double billed Medicare for services previously paid for, or that were paid for by another insurance entity." (SAC, ¶ 31). For example, Farnsworth's Second Amended Complaint alleges that Defendants directed Farnsworth to "mislead the Board of Trustees by instructing Farnsworth to 'leave out' of her research report to the Board of Trustees any mention that all trials did not have appropriate approvals. Contrary to Defendants' instructions, Ms. Farnsworth reported the lack of approval for the medical research to the Board. Not only were the research projects not approved, Defendants billed Medicare and Medicaid for these ineligible medical services even though payment was already received from the research grant funds." (SAC, ¶ 32).

Similarly, Farnsworth alleged that Defendants "also double billed when the service has already been paid for by one patient, but used on a different patient, who was also billed for the services." (SAC, ¶ 33). The Second Amended Complaint includes a second specific instance of a false claim that constituted an example of "double-billing" to Medicare (*see* SAC, ¶ 34). And, Farnsworth alleged that once she learned of these FCA violations in December of 2011, she objected to these billing practices by Defendants and reported the fraudulent billing issues to various members of each of the Defendants' respective management teams, including Steven

7

Daughtery, Northside CEO, Gary Searles, Northside CFO, Maggie Miklos, Defendants' Human Resources Director, and Audra Earle, Northside Chief Operating Officer and Chief Compliant Officer. (SAC, ¶ 35). She "warned each of these individuals repeatedly during this timeframe that such actions constitute submission of false claims to the United States Government," and even "instructed Defendants they were obligated to pay back the Medicare reimbursements Defendants received related to the[s]e above incidents." (SAC, ¶ 35).

Finally, in Section D of the Second Amended Complaint, Plaintiff provided the Court with more instances of protected conduct in a section aptly labeled "Additional Fraudulent Conduct to Maximize Profits." (SAC, ¶ D). In this section Farnsworth alleged, among other things, as follows:

> Northside Hospital encouraged staff to complete fraudulent reports for patients before and after discharge in order to fraudulently bill Medicare and Medicaid for unnecessary tests and treatment that maximized profits. For example, when Medicare and Medicaid benefits were exhausted patients were forced by Defendants to go home prematurely or were being advised by the staff to leave Northside Hospital in order to get better care at another facility. After discharge, the patient's medical records fraudulently indicated that they left against medical advice so that the hospital was able to still bill Medicare and Medicaid for services provided to the patient. **(**SAC, ¶¶ 36-37).

Plaintiff dove-tailed these allegations with specifics on when she discovered the fraudulent billing to Medicare by Defendants (December of 2011), dates she reported and objected to the practices (on a weekly basis beginning December 15, 2011 through the end of January of 2012), and to whom she reported the fraud (Steven Daughtery, Northside CEO, Gary Searles, Northside CFO, Maggie Miklos, Defendants' Human Resources Director, and Audra Earle, Northside Chief Operating Officer and Chief Compliant Officer). (SAC, ¶ 40). She also, once again, alleged that she explicitly "warned each of these individuals repeatedly during this timeframe that such actions constitute submission of false claims to the United States

8

Government," and that Defendants were obligated to pay back the Medicare reimbursements Defendants received related to these fraudulent submissions for reimbursement to the Government. (SAC, ¶ 40). These examples taken from Plaintiff's Second Amended Complaint are evidence of "direct" fraud by Defendant.

The above examples are attempts by Plaintiff to stop Defendants from violating the FCA by improperly submitting bills to Medicare for reimbursement for payment on services that were improperly "up-coded" from unsupervised resident reimbursement rates to physician rates (*see* Section A of the SAC); improperly submitted to Medicare for services performed by suspended physicians for whom Defendants were not entitled to received reimbursements from Medicare on (*see* Section B of the SAC); instances of fraudulent submissions of "double-billing" to Medicare (*see* Section C of the SAC and supporting facts); and, additional miscellaneous fraudulent claims submitted to Medicare (*see* Section D of the SAC). Farnworth even warned Defendants that they were committing Medicare fraud, and told Defendants they needed to pay back specific reimbursements they received from Medicare to which they were not entitled. These are classic examples of false claims. More importantly for purposes of Plaintiff's § 3730(h) claim, Plaintiff has sufficiently alleged that she engaged in an activity protected by the FCA because she acted in "furtherance of other efforts to stop to 1 or more" FCA violations. These protected activities satisfy the first element needed for a prima facie case under § 3730(h).

### 2. Defendants' Knowledge of Plaintiff's Protected Conduct.

FERA's change in the definition of what constitutes "protected conduct" for purposes of an FCA retaliation claim also changed the definition of what constitutes the employer's knowledge thereof. *Manfield*, 851 F. Supp. 2d at 204. Under the new statute, an employer's knowledge still mirrors the kind of activity in which the plaintiff must be engaged. *Id.* Since a

9

plaintiff now engages in protected conduct whenever she engages in an effort to stop an FCA violation, "the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer that the employee is engaging in protected activity." *Id.* Plaintiff's Second Amended Complaint alleges that on multiple occasions she reported fraudulent Medicare billing incidents to Steven Daughtery, Northside CEO, Gary Searles, Northside CFO, Maggie Miklos, Defendants' Human Resources Director, and Audra Earle, Northside Chief Operating Officer and Chief Compliant Officer "on a weekly basis" beginning on or about December 15, 2011 through the end of January of 2012. (SAC, ¶¶ 15, 22, 27, 30, 35, 40). She warned "each of these individuals repeatedly during this timeframe that such actions constitute submission of false claims to the United States Government." (*Id.*). Plaintiff also claims to have instructed Defendants they were obligated to pay back the Medicare reimbursements Defendants received related to the above incidents. (*Id.*).

Although certainly not required of her to make a prima facie case, Plaintiff's Second Amended Complaint even alleged *why* Defendants took no actions to remedy the situation, "Defendants took no action to remedy these issues. They were motivated to ensure their fraudulent billing practices continued in order to increase their bottom line, and to pad the bonuses paid to Defendants' leadership team." (SAC, ¶ 27). Accordingly, Plaintiff has provided an adequate factual predicate for her claim that the Defendants knew that she engaged in protected conduct.

> 3. **Discrimination Against Farnsworth Because of Her Protected Conduct.**

Plaintiff has satisfied the third prong of her *prima facie* case by alleging sufficient facts to support her claim that she was terminated because of her protected activity. *Manfield*, 851 F. Supp. 2d at 204. The FCA does not require a plaintiff be terminated ***solely*** because she engaged

10

in protected activity. *Id.* Rather, the employer need only be "motivated, at least in part by the employee's engaging in protected activity." *U.S. ex rel. Karvelas v. Melrose—Wakefield Hosp.,* 360 F.3d 220, 239 (1st Cir. 2004), (*citing* S. Rep. No. 99-345, at 35, reprinted in 1986 U.S.C.C.A.N. at 5300.) Thus, the question is whether the Second Amended Complaint contains a sufficient factual predicate to support Plaintiff's claim that the Defendants' actions in terminating here were "motivated, at least in part," by her protected activities. The Second Amended Complaint contains allegations more than sufficient to satisfy this standard.

According to the Second Amended Complaint, "Defendants placed Farnsworth on administrative leave on February 6, 2012, which effectively resulted in her termination because Plaintiff was never brought back to work. Her employment benefits were terminated on March 5, 2012." (SAC, ¶ 50). Plaintiff alleges that the Defendants' stated reason for placing her on indefinite administrative leave, and then not allowing her to return to work — because she was "insubordinate" — was pretextual. "The real reason that Farnsworth was placed on administrative leave was because she had direct knowledge of various types of fraudulent conduct occurring at Northside Hospital, including false billings in violation of the False Claims Act which she had reported to Steven Daughtery, Northside CEO, Gary Searles, Northside CFO, Maggie Miklos, Defendants' Human Resources Director, and Audra Earle, Northside Chief Operating Officer and Chief Compliant Officer, on a weekly basis beginning on or about December 15, 2011 through the end of January of 2012. (SAC, ¶ 49). Because there is sufficient factual support in the Second Amended Complaint for a finding that the Defendants were motivated to fire Plaintiff, at least in part, by Plaintiff's protected activities under the FCA, Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint should be denied.

*Manfield*, 851 F. Supp. 2d at 204 (denying Motion to Dismiss §3730(h) claim based, in part, on same pretext argument).

### B.     Defendants' "Scope of Duties" Argument Also Fails.

Predictably, Defendants' Motion also raises what is commonly referred to as the "internal reporting" or "scope of duties" argument.  But this argument has been rejected by multiple courts, including in *United States ex rel. Parato v. Unadilla Health Care Ctr., Inc*., 787 F. Supp. 2d 1329, 1342, (M.D. Ga. 2011) and *United States ex rel. Sanchez v. Lymphatx, Inc*., 596 F.3d 1300 (11th Cir. 2010).  Basically, Defendants' argue that because Plaintiff was "Vice-President of Quality and Risk Management," it was her job to report billing issues to Defendants.  But, in accordance with the Eleventh Circuit's decision in *United States ex rel. Sanchez v. Lymphatx, Inc*., 596 F.3d 1300 (11th Cir. 2010), this argument by Defendants is factually and legally infirm.

In *Sanchez*, the employee complained internally to the owners of her company about several of the company's practices which she believed were illegal. The defendants argued that Sanchez's conduct was comparable "to the sort of internal reporting that some [other] circuits have held falls outside the scope of § 3730(h)." *Id*. at 1304. However, the Eleventh Circuit noted that even those courts recognized that internal reports alerting an employer to fraudulent or illegal conduct may be sufficient to put the employer on notice. The Eleventh Circuit concluded: "Sanchez's allegations that she complained about the defendants' 'unlawful actions' and warned them that they were incurring significant criminal and civil liability would have been sufficient, if proven, to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act." *Id*.

Notably, *Sanchez* relied upon the pre-2009 amendment of § 3730(h) by looking to see if the Defendants were made "aware of the possibility of litigation under the False Claims Act." But, even when analyzing *Sanchez* under the pre-2009 amendment (which had a much higher threshold for what constituted a protected activity), the Eleventh Circuit still rejected the same "scope of duties" argument Defendant clings to here. The question now, post-2009, is not simply whether Plaintiff was "doing her job," but whether her internal complains were sufficient to support a reasonable conclusion that Defendant was aware of that Plaintiff's actions were done in "furtherance of other efforts to stop to 1 or more" FCA violations. Farnsworth warned Defendants that their actions constituted submission of false claims to the United States Government. She even instructed Defendants they were obligated to pay back the Medicare reimbursements they receive to which they were not entitled. Plaintiff also informed AHCA of Defendant's severe understaffing and as to abuse allegations.

In sum, this Court should rely on the post-2009 amendment of § 3730(h), including its considerably more lenient standard for what constitutes a protected activity under the FCA and, like the Eleventh Circuit did in *Sanchez*, reject Defendants' "scope of duties" argument entirely. As demonstrated by the decisions in both *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300 (11th Cir. 2010) and *United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1342, (M.D. Ga. 2011), Congress amended the FCA to expand its whistleblower protections so that fraud would be uncovered. Who is better able to effectuate Congress' intent than employees, like Plaintiff here, who find and then try to stop fraud? Defendants' Motion to Dismiss must be denied.

### C. Farnsworth's Second Amended Complaint Includes Sufficient Allegations Against Each Defendant.

By ignoring the plain language in the Second Amended Complaint, Defendants' Motion takes a parting shot at the Second Amended Complaint by alleging Farnsworth failed to make substantive allegations against three of the four Defendants, specifically: HCA, Healthtrust, and Parallon. But, Defendants are wrong. In reality, by raising this argument Defendants are doing nothing more than relying upon a convoluted and confusing tangle of business entities it utilizes to run Northside Hospital in an attempt to escape liability from this lawsuit. This should not be permitted by the Court.

As explained in the Second Amended Complaint, Defendants HCA Inc. and Healthtrust, Inc.- The Hospital Company, ("together known as HCA") are Delaware corporations with their principal place of business in Nashville, Tennessee. (SAC, ¶ 5). HCA is the parent corporation of Northside Hospital and directs all policies and procedures followed by the staff at Northside Hospital. (SAC, ¶ 8). Defendant Galencare, Inc. operates the d/b/a known as Northside Hospital ("Northside Hospital"), and is a Florida corporation with its principal place of business in Pinellas County, Florida. (SAC, ¶ 6). Northside Hospital is a 288-bed teaching hospital accredited by the American Osteopathic Association for its Internship, Residency, and Fellowship programs. (SAC, ¶ 9). Parallon Business Solutions, LLC is a subsidiary of HCA and provides medical records personnel to Northside Hospital. (SAC, ¶ 10). Parallon is responsible for billing the Center for Medicare and Medicaid Services ("CMS") for medical services rendered at Northside Hospital, and other HCA facilities. (SAC, ¶ 10).

Farnsworth worked at Northside Hospital as Vice President of Quality and Risk Management. Then, it was "Defendants" (plural), meaning HCA, Healthtrust, Parallon, and Galencare, who "collaborated and engaged in a range of improper and fraudulent activities to

increase the amount of the reimbursement that Northside Hospital received from Medicare by filing false claims for reimbursement with the United States Government."  (SAC, ¶ 14). Farnsworth went to members of management in each of the four Defendants' business operations in an attempt to prevent and object to the fraudulent Medicare billing committed at Northside. For example, Farnsworth's Second Amended Complaint alleged that "Farnsworth reported the fraudulent billing practices committed by Defendants to multiple high-ranking members of Northside's management, including to Defendants' CEO, Steven Daughtery; Defendants' CFO, Gary Searles; Defendants' Human Resources Director, Maggie Miklos; Northside COO, Audra Earle; HCA Division Vice President of Quality, Linda Lemonsteiner; and, finally, Jill Fainter in HCA's leadership group in Nashville."  (SAC, ¶ 15).

Clearly, Farnsworth has alleged that each of the four corporate Defendants engaged in conduct prohibited by the FCA.  The mere fact that she is unable to untangle with precision the complicated web of entities Defendants have spun around Northside Hospital prior to the commencement of substantive discovery does not warrant dismissal at the pleading stage.  Nor does her utilization of the plural term "Defendants" to collectively refer to all of the defendants named in this lawsuit.  Farnsworth has sufficiently pled her 31 U.S.C. § 3730(h) claim against each of the Defendants.  She has no interest in prosecuting her claims against Defendants who are not culpable.  To the extent that discovery later proves that one or more of the Defendants is not a proper defendant, Farnsworth will act accordingly.  But such a dismissal is premature based upon the present facts of record, and simply not warranted in light of nothing more than unsubstantiated arguments by Defendants' counsel.

Dated this 23rd day of July, 2015.

          Respectfully submitted,
          */s/ Steven G. Wenzel*
          **Steven G. Wenzel**
          Florida Bar No.: 159055
          **Brandon J. Hill**
          Florida Bar No.: 37061
          **Wenzel Fenton Cabassa, P.A.**
          1110 North Florida Avenue, Suite 300
          Tampa, Florida 33602
          Telephone: (813) 224-6413
          Facsimile:  (813) 229-8712
          Email: swenzel@wfclaw.com
          Email: bhill@wfclaw.com
          Email: mcambronero@wfclaw.com
          **Attorneys for Plaintiff**

          */ s / J. Meredith Wester*
          **J. Meredith Wester**
          Florida Bar No. 881317
          **MECHANIC NUCCIO HEARNE & WESTER P.A.**
          18560 N. Dale Mabry Hwy.
          Lutz, Florida 33548
          Telephone (813) 968-1002
          Facsimile: (813) 968-1502
          Email: jmw@mechaniknuccio.com
          **Co-counsel for Plaintiff**

## **CERTIFICATE OF SERVICE**

     **I HEREBY CERTIFY** that on this 23rd day of July, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of this filing to:

| | |
|---|---|
| **Abid R. Qureshi** | **Martin Golberg** |
| District of Columbia Bar No. 459227 | **Greg J. Weintraub** |
| **Alice S. Fisher** | **LASH & GOLDBERG LLP** |
| District of Columbia Bar No. 437492 | 110 SE 2nd Street, Suite 1200 |
| **LATHAM & WATKINS LLP** | Miami, Florida 33131 |
| 555 Eleventh Street, NW, Suite 1000 | Email: mgoldberg@lashgoldberg.com |
| Washington, D.C. 20004-1304 | Email: gweintraub@lashgoldberg.com |
| Email: abid.qureshi@lw.com | **Attorney for Defendants** |
| Email: alice.fisher@lw.com | |
| **Pro Hac Vice Attorney for Defendant** | |

          */s/ Steven G. Wenzel*
          **Steven G. Wenzel**